266 So.2d 806

Pride DAWSON

v.

STATE.

8 Div. 149.

Court of Criminal Appeals of Alabama.

June 30, 1972.

Rehearing Denied Aug. 1, 1972.

C. E. Carmichael, Jr., Tuscumbia, Robert Straub, Decatur, for appellant.

**596**

William J. Baxley, Atty. Gen., and Richard F. Calhoun, Asst. Atty. Gen., for the State.

PER CURIAM.

Appellant, Pride Dawson, stands convicted of the second degree murder of Bobby Joe Fusher. He was sentenced to serve thirty years in the state penitentiary.

Curtis Ray Quinn testified that on the 14 of May 1970, he was living in West Memphis, Arkansas. He worked at the same place as Bobby Joe Fusher and had known him about a month. On the day in question he and his family drove to Colbert County, Alabama, in Fusher's automobile. After leaving Quinn's wife and children at her father's home, he and Fusher visited various places drinking beer or whiskey. They arrived at a place called the 157 Motel around midnight. The state's evidence was that the place was operated by Pride Dawson, but not as a motel. Dawson was standing in the doorway when Quinn and Fusher started inside. Dawson said to Quinn, "You dirty dog, where is my money." Quinn told him he didn't have the money but would pay him the next time he came up. He told Dawson all he had was some change and a pistol and pulled the gun from his pocket and showed it to Dawson. Dawson whirled around, left the room and returned with a pistol in his hand. He hit Quinn on the side of the head with the pistol. Witness stated he heard a shot and "(W)hen he hit me I seen the fire from the gun and it almost busted my eardrum * * *." When Dawson came back with the gun Quinn had put his pistol and change back in his pocket and had ordered a six pack of beer.

When the gun fired Quinn and Fusher ran out the door together and into the parking lot. They got behind a parked car and Fusher fell or lay down and the last time Quinn saw Fusher he was on his back behind the car.

Quinn got into Fusher's car but Dawson stopped him from leaving by covering him with a pistol. At Dawson's insistence Quinn went back into the motel where he stayed for sometime until he made his escape. While there Quinn saw somebody struggling to get something out the door. It was a heavy object, covered with a quilt which came down in a "V" shape, "like somebody laying over a shoulder." Dawson told Quinn if he started running his mouth about what happened he would be next.

Michael Ray Jordan, whose mother is married to Pride Dawson's brother, testified he was at the 157 Motel the night in question and heard the argument between Quinn and Dawson. He heard a shot and saw Quinn and Fusher as they ran out the door and saw Fusher fall down near the automobile. Blood was coming from Fusher's mouth. There was blood on his face and clothes and a large quantity of

blood on the ground around him. The Fusher boy did not move or say anything. He saw Quinn go back in the motel with Dawson, who had a gun in his hand.

Dawson told witness and others to get rid of Fusher and brought a quilt out of the motel. Witness and three other men wrapped Fusher in the quilt and put him in the trunk of a car. Witness and Howard Winchester drove Fusher to La Grange Mountain and left him on the side of an old logging road, still wrapped in the quilt. Dawson was still at the motel when they returned. There was blood in the trunk and Dawson gave Winchester two or three dollars and told him to get the car cleaned up.

Dawson announced he was going home and gave his gun to Jesse Woodall and told Woodall and witness to keep Quinn there. After Quinn left Woodall gave the gun to Jordan.

Wayne Vickery a deputy sheriff of Colbert County testified that on June 4, 1970, in response to a call he went to La Grange Mountain and located a body under a pile of brush. A quilt was wrapped around the upper part and when the quilt was removed there was nothing but bone on the top part of the body.

Mr. Van Pruitt, a state toxicologist, testified he examined the decomposed remains of a body at the Spry Funeral Home in Sheffield. Identification of the body as that of Bobby Joe Fusher was made by comparison of the teeth in the skull with Fusher's dental records from the Department of the Army. Due to decomposition and insect ravage there were no viscera organs remaining and no flesh was attached to the skull. The long bones, the rib cage and the skull showed no fracture. There were no breaks, nothing to indicate that a force had been brought to bear to fracture these bones and no holes penetrating the skull. He found nothing from the remains that gave any indication of a probable mechanism of death, and could give no opinion as to cause of death.

This question was asked by the district attorney:

"Assuming * * * that the person might have been shot and assuming that there is testimony that the person * * very shortly thereafter was bleeding from the mouth, and assuming that the time lapse of approximately three weeks from the time of the original shot to the time you examined the body, and assuming the body were in the summer time, in warm weather, left out in an open area, exposed to the elements, could you necessarily determine whether or not that person had been shot?"

The witness answered:

"I could not say I could necessarily ascertain the fact that the individual had been shot under those circumstances."

Defense counsel insists that since the cause of death could not be determined from an examination of the decomposed remains of the body there was a fatal variance between the indictment charging that defendant killed deceased by shooting him with a gun and the failure to prove the means of the killing.

There was no objection to the evidence on the ground of a variance and no requested charge to the jury on the same ground. Taylor v. State, 148 Ala. 565, 42 So. 997.

However, we are of opinion the evidence of the firing of the gun by defendant, the deceased falling with blood exuding from his mouth; his being hauled away, dead or alive, in a very short time and left in the woods at defendant's direction, shows there was no variance between the instrument of death alleged and that proved. As was said in DeSilvey v. State, 245 Ala. 163, 16 So.2d 183, "A well connected train of circumstances may be as cogent of the existence of a fact as any array of direct evidence."

We are of opinion the evidence presented questions for the determination of the jury and was sufficient to sustain the

verdict. There was no error in refusing the general affirmative charge, nor in denying the motion for a new trial.

State's Exhibits 5, 6, 7, are photographs of the decomposed body and the area where the remains were found. Exhibit 5 shows a closeup view of the skeleton of the upper part of the body. In Exhibit 6 a part of the skeleton can be seen, while the lower portion is clothed in pants and shoes. Exhibit No. 7 shows the lower part of the body, dressed in pants and shoes, the top part covered with brush. The quilt is shown in this picture.

Counsel for defendant objected to each of these photographs on the grounds that it does not show the location of the wounds, cause of death, time of death, relative position of combatants, if any, type of instrument used, if any; does not connect the defendant with the death, in no way identifies the victim. Is not properly identified and its only purpose is to prejudice and inflame the minds of the jury.

■ We find no error in the admission of the photographs. They were properly identified as correctly portraying the scene and the condition of the objects at the time they were made. The other objections were not well taken.

Officer Wayne Vickery was present when the photographs were taken. He testified it was not possible to identify the person then and there by looking at it. There was no wallet or other means of identification on the body.

■ The toxicologist testified he examined the long bones of the upper legs as to their apparent length and reached an approximation of height of 5' 10". He examined the size of the long bones of the legs and upper arms, including the rib cage, and estimated the weight range as approximately 150 to 170 pounds. His examination of the skull or the bones of the head determined the suture lines were distinct and open, which is the case in a young person. As a person grows older the lines cement and are not so distinct. He determined the victim to be a rather young adult, in his early twenties. Fusher's mother testified he was 19 years of age. Two state's witnesses estimated his age as 20 to 21. While there was no testimony as to the height and weight of Fusher, the toxicologist stated that from the information given him, his examination of the skeleton, and a comparison of the teeth found in the skull with Fusher's dental records from the Department of the Army he was able to identify the body as that of Bobby Joe Fusher. We are of opinion the photographs were admissible on the question of identification. Hines v. State, 260 Ala. 668, 72 So.2d 296.

On cross examination the toxicologist was asked whether from his examination of the skeleton he found any facts from which he could conclude the deceased had been shot? He answered:

"I did not find facts to indicate he had been shot, no sir."

The witness was then asked what he found on cross examination of the clothing and shirt. His answer was that the shirt was badly rotted, the fabric extremely fragile. There were numerous holes in the shirt and a special type analysis was made to detect lead and other elements under the assumption that if a projectile of a lead alloy passed through in a spinning motion, such as a bullet, it would rub off on the fabric, but was unable to find any evidence of such.

He was asked whether from his examination of the shirt he could not find fact that the deceased had been shot. He answered:

"I did not find any alloy to suggest that those holes were the result of projectile."

On redirect examination the witness was asked how much of the shirt was left. He answered the shirt a knit type was almost completely unravelled, "So essentially what I had to work with was the body portion or the chest portion of the shirt of both

the front and back with a portion of a short sleeve of the upper arms."

Thereupon this question was asked:

"Q. Could you state to the jury what vital organs of the body or the circulatory system that could have been penetrated by a bullet without leaving a mark or a fracture to any part of the circulatory system?"

Defense counsel objected to the question on the grounds, "(I)t calls for mere conjecture, unauthorized conclusion, does not state from which angle the shot came, what size bullet, what size shell, there are too many, unknown factors in that question for any expert to answer."

The court overruled the objection. The witness answered:

"There would be the possibility of the carotid artery and jugular vein of the neck, you have the brachial artery of both upper arms extending to the branches of the lower arms. I would say essentially though that the chest would have been shielded by the shirt with the exception of the portion of the shirt which I wasn't able to work with, which would be the waistband, that could expose the organs of the abdomen including the kidneys at that level and perhaps the lower margin of the liver. The trousers were pretty well intact which would have covered * * *".

Defense counsel objected, moved to exclude the answer and for a mistrial on the grounds assigned for original objection. The objection and motion were overruled.

Defense counsel then objected to "further testimony because it is not responsive and is going to some other line of testimony."

■ While generally the objection for lack of responsiveness in an answer is available as a matter of right only to the party asking the question, (See 18A Ala. Dig., Trial ☜74 for cases) the court stated:

"There was a matter in the answer that was not, I don't think, responsive to the question. Read his answer."

The court reporter read the answer and the court said:

"That part of the answer that she just read will be stricken and disregarded by the jury."

Thereupon the district attorney inquired as to what part of the answer was to be excluded. The court asked that the reporter again read part of the answer and the following occurred:

"By the Court Reporter: The chest would have been shielded by the shirt with the exception of the portion of the shirt which I wasn't able to work with, which would be the waistband."

"Mr. Graham: That is the part you are specifying?

"By the Court: Yes sir, Read the rest of the answer.

"By the Court Reporter: That could expose the organs of the abdomen including the kidneys at that level and perhaps the lower margin of the liver. The trousers were pretty well intact which would have covered * * *.

By the Court: All right.

Defense counsel: "At the beginning of his testimony he said it was possible and again we assign that is mere conjecture and ask that the entire answer be stricken.

"By the Court: Let's go back to the question now. Read the question again.

"By the Court Reporter: Could you state to the jury what vital organs of the body or the circulatory system that could have been penetrated by a bullet without leaving a mark or a fracture to any part of the skeletal system?"

"By the Court: Overruled on the last part."

**600**

■ We are of the opinion the court properly overruled the objection to this testimony of the toxicologist.

■ It is insisted in brief that the court committed reversible error in allowing, over objection, state's witness Quinn to testify to his movements and actions after the occurrence in question. The witness, in response to interrogation stated the last time he saw Bobby Fusher he was lying on the ground beside the car; that he had made a search for him after he left there that night but never found him; that he did not have personal knowledge of what happened to him after he saw him on the ground; that he went back to the motel around 2 o'clock that night and drove Fusher's car away after someone pushed it; that he never got the gun he had with him that night, he didn't know who got it; that he returned to West Memphis, Arkansas, the next day and contacted Fusher's people, but found no trace of him there; that the next time he saw Pride Dawson was when he was brought from the courthouse to the jail some three or four weeks after this incident occurred and that he had never discussed the matter with him since that night.

We find no error in the court's rulings complained of here.

Charges refused to defendant which were correct statements of the law were covered by the court's oral charge or charges given at defendant's request.

We find no reversible error in the record. The judgment is affirmed.

The foregoing opinion was prepared by the late lamented Presiding Judge PRICE and was approved by the whole court in conference subject only to correction of minor typographical errors. These having been made the opinion is hereby adopted by the Court.

Affirmed.

CATES, P. J., and ALMON, TYSON and HARRIS, JJ., concur.